# TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON,

an Oregon municipal corporation,
*Plaintiff,*

*v.*

# PORTLAND GENERAL ELECTRIC COMPANY,

an Oregon corporation,
*Defendant,*

*and*

# The QUADRANT CORPORATION,

a Washington corporation,
*Respondent,*

*and*

# The ESTATE OF HAROLD RAY,

*Appellant,*

*and*

Saibra Vickland GOLDSTEIN,
Dorothy Holbertson, Rochelle Holbertson,
Barbara Jean McKalson, Haila H. Vickland,
Mary Melody Vickland, Paul Melvin Vickland,
Valerie Louise Vickland and Robin Ray Welch,
*Defendants.*

(C96-0474CV; CA A98567)

985 P2d 222

Susan C. Glen argued the cause for appellant. With her on the briefs were Thomas H. Tongue and Dunn, Carney, Allen, Higgins & Tongue.

John J. Dunbar argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer,* Judges.

LANDAU, P. J.

---

* Brewer, J., *vice* Riggs, P. J., resigned.

## LANDAU, P. J.

Our task in this case is to determine who owned a narrow strip of land that the Tri-County Metropolitan Transportation District (Tri-Met) condemned to make way for its Westside Light Rail Project. To the owner go the condemnation proceeds. Ownership is disputed on the basis of language in a 1960 deed granting title to a farm on which the strip is located "excepting" the narrow strip of land. Appellant, the successor in interest to the grantor, contends that, the narrow strip having been excepted from the grant, it was retained by the grantor and therefore belongs to his successor in interest. Respondent, the successor in interest to the grantee, contends that, because the excepting language was ineffective, the narrow strip was not retained by the grantor and was instead granted with the rest of the farm to the grantee and its successors in interest. We conclude that the language in the 1960 deed "excepting" the narrow strip of land means what it says and that, in consequence, the successor in interest to the grantor is entitled to the condemnation proceeds.

The relevant facts are not in dispute. Rachel Hawthorn owned a farm located in Washington County. In 1908, she granted to the Oregon Electric Railway (OER) a 60-foot-wide easement over the farm, to permit OER to run freight and a commuter rail service between Portland and Washington County. The agreement granting OER the easement also permitted OER to enter and leave the premises and required OER to construct a depot, two open crossings with cattle guards, and other facilities on the Hawthorn property. Those facilities were to be confined "as far as possible" to the easement corridor, but the easement agreement left open the possibility that construction could spill over onto land beyond the easement itself.

OER operated a regular schedule of passenger and freight trains beginning in 1908. It continued regular operations until 1933, when it discontinued its passenger service altogether. OER continued limited freight service until the 1970s.

Meanwhile, in 1933, Harold Ray purchased the Hawthorn farm and, over the years, added several other parcels of land to it. He also granted various easements over the property, including an easement to Portland General Electric (PGE) in 1942 and an easement to OER in 1951, which allowed an additional 15 feet on either side of the 1908 right-of-way to lay gravel and to grade for support of the earlier right-of-way.

In 1960, Ray sold his property to the Hawthorn Farm Company and several individual investors. The warranty deed conveyed the property, described by metes and bounds, subject to the following clause:

> "EXCEPTING, however, from the above described area, that portion of the Oregon Electric Railroad right-of-way lying within the boundaries thereof; containing a net area of 411.544 acres, more or less, SUBJECT to that certain easement granted to the Oregon Electric Railway Company [granted in 1951]."

The deed also contained a covenant of title declaring that Ray was "lawfully seized in fee simple of the above granted premises free from all encumbrances except the following * * *." At that point, the deed listed, among other things, the 1908 easement to OER, the 1941 easement to PGE, and the 1951 easement to OER.

Sometime after 1960, the individual purchasers sold their interest in the property to Hawthorn Farm Company. In 1978, Hawthorn Farm Company conveyed its interest in the property to the Quadrant Corporation (Quadrant).

In 1996, Tri-Met initiated this condemnation action to acquire, among other things, the portion of the old Hawthorn Farm that had been granted to OER. Tri-Met named as defendants Quadrant, the heirs of Harold Ray (who had since died),[1] and PGE. The trial court determined that PGE had abandoned its interest in the 1941 easement and was not entitled to any condemnation proceeds. PGE did not appeal that determination. Quadrant and the estate then both moved for summary judgment on the issue of their competing

---

[1] The parties later stipulated to the substitution of the Estate of Harold Ray for the heirs.

ownership claims. The trial court determined that, notwith-standing the excepting clause of the 1960 warranty deed, Harold Ray never intended to retain title to the narrow strip on which OER was permitted to operate. The court concluded that Quadrant owns the property and is entitled to the con-demnation award from Tri-Met and entered summary judg-ment accordingly.

The estate appeals, arguing that the trial court erred in failing to give effect to the terms of the 1960 warranty deed, which excepted from the grant of property to Quad-rant's predecessors in interest the narrow strip of land on which OER had been granted a right-of-way. Quadrant con-tends that, under *State ex rel Dept. of Trans. v. Tolke*, 36 Or App 751, 586 P2d 791 (1978), *rev den* 286 Or 149 (1979), there is a "constructional preference" against such excepting clauses.

In *Tipperman v. Tsiatsos*, 327 Or 539, 964 P2d 1015 (1998), the Supreme Court explained the legal principles that govern the construction of instruments creating an interest in land, in that case, an easement:

> "First, in such cases, '[i]t is the duty of the court to declare the meaning of what is written in the instrument.' *Minto v. Salem Water Etc. Co.*, 120 Or 202, 210, 250 P 722 (1926). Further, the court will look beyond the wording of the instrument 'only where there is an uncertainty or ambigu-ity.' *Fendall v. Miller*, 99 Or 610, 619, 196 P 381 (1921). If the wording at issue is uncertain or ambiguous, then the court must determine the intent of the original parties by examining the relevant surrounding circumstances."

*Id.* at 544-45. The court further explained that, only as a "last resort," when ambiguity persists—after an examination of the language and the surrounding circumstances—is it appropriate to rely on a rule of construction. *Id.* at 545. In examining the language of the instrument creating an inter-est in land, we give words their ordinary meaning, unless the context otherwise suggests that a different meaning was intended. *Id.* at 548.

With those principles in mind, we turn to the 1960 warranty deed that is the subject of the parties' dispute. That deed granted to Quadrant's predecessors in interest the

Hawthorn Farm, "EXCEPTING * * * that portion of the Oregon Electric Railroad right-of-way" that was conveyed in 1908. Excepting clauses are common in conveyancing instruments and generally have the effect of "tak[ing] something out of the thing granted that would otherwise pass by the deed." *Rall et ux. v. Purcell, et ux.*, 131 Or 19, 21, 281 P 832 (1929). The excepting clause in the 1960 warranty deed therefore strongly suggests that Ray, the grantor, intended to grant title to everything *except* the land on which OER exercised its right-of-way.

The balance of the excepting clause confirms that conclusion. It stated that the effect of the excepting clause was to convey a "net area" of approximately 411 acres. The word "net" generally refers to a quantity arrived at after deductions. *See Webster's Third New Int'l Dictionary*, 1519 (unabridged ed 1993) (defining "net" as "free from all * * * deductions"). It seems fairly clear that to produce a "net area" granted to Quadrant's predecessors required the deduction of some acreage in the first place. In that context, the excepting clause makes sense; it explains that the "net area" granted to Quadrant's predecessors was the total acreage minus the acreage subject to the OER right-of-way that Ray excepted from the grant.

Quadrant insists that the 1960 warranty deed cannot be read in that straightforward fashion. According to Quadrant, other provisions of the deed, along with our decision in *Tolke*, command a different reading of the language.

Quadrant relies, in particular, on the language in the covenant of title, which warranted that Ray had title to "the above granted premises" free from encumbrances except, among other things, those that applied to the OER right-of-way. Quadrant reasons that, given that the covenant of title expressly excepted the easements that applied to the OER right-of-way, it makes no sense to warrant title to "the above granted premises" unless those premises included the land on which OER exercised the right-of-way.

Quadrant's reasoning is based on a flawed assumption, namely, that the encumbrances listed in the covenant of title acted to encumber *only* the land that was subject to the

original 1908 OER right-of-way. That was not the case, however. The original 1908 grant expressly permitted OER the right to enter the land outside the 60-foot-wide easement to erect various structures and crossings and left open the possibility that OER could build on land outside the easement itself. Moreover, the 1951 easement expressly permitted OER to make use of up to 15 feet on either side of the original 60-foot-wide right-of-way. In that context, the covenant of title in the 1960 warranty deed makes sense. It warranted title to the land other than what was expressly excepted, subject to encumbrances that applied to the remaining property.

Quadrant's argument additionally fails to account for the excepting clause and the "net area" language. Reading the covenant of title as Quadrant suggests would require that we simply ignore the ordinary meaning of both portions of the warranty deed. Doing so would contravene our charge to give meaning to what was written. *Tipperman*, 327 Or at 544.

We are likewise unpersuaded by Quadrant's reliance on *Tolke*. In that case, a deed conveyed an interest in property subject to an excepting clause. 36 Or App at 755. We examined the language of the excepting clause and concluded that it was reasonably capable of at least two different meanings. *Id.* at 759-60. In resolving the ambiguity, we applied a "constructional preference" in favor of the grantee. *Id.* at 760-61. In contrast, in this case, we are confronted with only one reasonable construction of the language contained in the deed. As required by the Supreme Court's decision in *Tipperman*, and consistent with our own decision in *Tolke*, we therefore decline to invoke any rules of construction to determine the meaning of the disputed deed.

Reversed and remanded for entry of judgment in favor of the Estate of Harold Ray.